## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | |
|---|---|
| In re:<br><br>John Wayne Mocadlo,<br><br>      Debtor. | Chapter 7<br><br>Case No. 21-20971 (JJT) |
| Bonnie C. Mangan, Chapter 7 Trustee,<br><br>      Plaintiff,<br><br>v.<br><br>Raymond J. Bastarache and<br>Wavecrest Investment Properties, LLC,<br><br>      Defendants. | Adv. Pro. No. 23-02016 (JJT)<br><br>Re: ECF Nos. 1, 16 |

## MEMORANDUM OF DECISION
## <u>POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

### <u>Appearances</u>

Joanna M. Kornafel, Esq.
Robert M. Fleischer, Esq.
Green & Sklarz LLC
One Audubon Street, 3rd Floor
New Haven, CT 06511
*Attorneys for Plaintiff*

Thomas J. Sansone, Esq.
Carmody Torrance Sandak & Hennessey LLP
195 Church Street, P.O. Box 1950
New Haven, CT 06509-1950
*Attorney for Defendants*

This Adversary Proceeding was brought by Plaintiff Bonnie C. Mangan, Chapter 7 Trustee (Trustee) of the bankruptcy estate of John Wayne Mocadlo (Debtor), on October 20, 2023 (Complaint, ECF No. 1), and seeks the avoidance of a transfer of property made by the Debtor to Defendant Raymond J. Bastarache and then to Defendant Wavecrest Investment Properties, LLC. After multiple stipulated extensions, the Defendants answered the Complaint on March 21, 2024 (Answer, ECF No. 16). The Court held a trial on the Complaint on October 28 and 29, 2025.[1] After trial, the parties submitted post-trial briefs (ECF Nos. 69, 70) and replies (ECF Nos. 71, 72). The Court then took the matter under advisement. For the following reasons, the Court finds that the transfer to Bastarache was constructively fraudulent and that he and Wavecrest (as a subsequent transferee) are jointly and severally liable for the sum of $140,732.96 plus interest.[2]

1. Findings of Fact[3]

The Court finds the following facts by clear and convincing evidence.[4]

The Debtor was a prior owner of property located at 27 Turnberry Road, Wallingford, CT 06492 (Property), which he purchased on August 14, 2019, for $610,000. P. Ex. 29. To finance the purchase, the Debtor borrowed $580,000, which

[1] The transcripts of the trial are available at ECF Nos. 61 (October 28, 2025) (Tr. 1) and 62 (October 29, 2025) (Tr. 2).
[2] The Trustee withdrew Counts One and Three of the Complaint alleging an actual intent fraudulent transfer under the Bankruptcy Code and state law, Tr. 1 3:16–19; ECF No. 45, leaving only the constructive fraudulent transfer claims, Counts Two and Four, and the recovery claim, Count Five.
[3] Any Findings of Fact that are properly Conclusions of Law are so held.
[4] Although constructive fraudulent transfer claims under the Bankruptcy Code are subject to a preponderance of the evidence standard, *Clinton Cnty. Treasurer v. Wolinsky (In re Martin)*, 511 B.R. 34, 38 (N.D.N.Y. 2014), constructive fraudulent transfer claims under the Connecticut Uniform Fraudulent Transfer Act (CUFTA) require clear and convincing evidence, *Cockerham v. Westphalen*, 225 Conn. App. 484, 498, 317 A.3d 166, 175 (2024).

was secured by a first mortgage on the Property. Statement of Uncontested Facts (SUF, ECF No. 45) ¶ 12. After the Debtor had extensive renovations done on the Property, *compare* P. Ex. 9 *with* P. Ex. 10, he borrowed $325,000 from Bastarache on February 6, 2020, through a promissory note (Note). SUF ¶ 1. The Note had an interest rate of 14.0% per annum and was secured by a second mortgage on the Property. SUF ¶ 1. As part of the transaction, the Debtor prepaid Bastarache six points for the Note in the amount of $19,500, which ultimately resulted in the Debtor receiving $302.683.22 in net proceeds. SUF ¶¶ 2, 3. Under the terms of the Note, the Debtor was to make monthly interest-only payments in the amount of $3,791.67 until the loan was paid in full.[5] SUF ¶ 4. The Debtor made such payments for April, May, June, and July 2020. SUF ¶ 5.

Meanwhile, the Debtor listed the Property for sale in March 2020. Tr. 1 45:3–5. Initially listed for $1,290,000, the Debtor dropped the price to $1,099,000 by the end of July 2020. Tr. 1 147:18–25; P. Ex. 8. Around the end of July, the Debtor informed Bastarache that he could not make the next required payment on the Note. Tr. 1 142:10–11. On August 11, 2020, Bastarache formed Wavecrest, which he wholly owned and controlled. SUF ¶¶ 6–8. By mid-August 2020, Bastarache told the Debtor that he would take title to the Property for a stated consideration of $900,000.[6] Tr. 1 149:2–11.

---

[5] The Note required that payment in full be made on or before February 6, 2021. P. Ex. 6. It had no prepayment penalty. *Id.*

[6] This stated amount ostensibly included satisfaction of both the Note and the first mortgage. Bastarache, however, did not provide the Debtor with a payoff amount for the Note, SUF ¶ 10, so this stated consideration was no more than an estimate.

3

On August 31, 2020, the Debtor transferred the Property to Bastarache by quitclaim deed (Transfer). SUF ¶ 9. Bastarache paid no money for the Transfer, nor did he provide any payoff amount owed by the Debtor prior to the closing on August 31, 2020, but he did take the Property subject to a first mortgage. SUF ¶¶ 10, 12. Bastarache transferred the Property to Wavecrest for no recited consideration the following day. SUF ¶¶ 13, 14. Bastarache then completed the remaining renovation work and relisted the Property for sale on October 6, 2020, for $1,185,000. SUF ¶ 15. The Property subsequently went under contract shortly thereafter. SUF ¶ 16. A third-party buyer closed on the Property on December 14, 2020, paying the $1,185,000 list price. SUF ¶ 15-2.[7]

After the Transfer, Bastarache paid off the first mortgage, which then totaled $555,257.51. SUF ¶ 12. As for the Note, the parties differ as to its value on the date of the Transfer. The Trustee argues that, because the six points the Debtor paid on the Note are not in writing, they should not be credited. The parties, however, stipulated to the six points having been paid, SUF ¶ 2, and the Court otherwise credits Bastarache's testimony as to their existence. Tr. 1 139:7–9. Thus, the beginning principal amount of $325,000 on February 6, 2020, results in a payoff amount of $332,583.34 as of the date of the Transfer.[8]

As part of the consideration given for the Transfer to be weighed in connection with its "reasonably equivalent value" analysis, the Court also credits

---

[7] There are two different paragraph 15s in the SUF. This citation refers to the second instance.

[8] The Trustee's Exhibit 30A shows calculations of compound interest, but the payments themselves evidence that only simple interest was employed (*i.e.*, ($325,000 x 14%)/12 = $3,791.67). Therefore, the payoff would have been the $325,000 principal plus two months of unpaid interest.

the associated closing costs of $2,900 for Bastarache's and the Debtor's attorney fees.[9] D. Ex. C. The Court, however, does not credit the $3,000 value for one month's rent allegedly provided to the Debtor after the Transfer because such is not reflected anywhere other than Bastarache's after-the-fact self-serving testimony. Tr. 2 31:20–32:6. Thus, the total "reasonably equivalent value" provided to the Debtor for the Transfer is $890,740.85, which is the sum of the first mortgage payoff, the payoff amount on the Note, and the above-allowed attorney's fees.[10]

As for the fair market value of the Property at the time of the Transfer, the Court begins its analysis by noting that most of the renovation work on the Property was already complete prior to its conveyance to Bastarache, which the Defendants acknowledge. Intervening on this timeline was the beginning part of the COVID-19 pandemic. Bastarache credibly testified that, during the pandemic, the Debtor hosted at least one large party at the Property, which resulted in some damage to the Property that is not reflected in the exhibit photographs associated with the earlier listing during the Debtor's ownership. Tr. 1 143:17–144:5. The Debtor left the Property in various conditions of disarray that were detailed at trial. After the Transfer, Bastarache expended an additional $64,431.90 for various

---

[9] The money provided by Bastarache for the Debtor's closing attorney is easily value afforded the Debtor. The question of whether Bastarache should also be able to count his own closing attorney's fees is a harder one, but the Note provided that the Debtor would pay, in addition to the principal balance and interest, "all costs of collection, including a reasonable attorney's fee[.]" The Court has no problem in counting the $2,000 paid to Bastarache's closing attorney as both a "cost of collection" and "reasonable" under the circumstances.

[10] This amount is close to—but less than—the nominal value stated by Bastarache, but exceeds the "cost to acquire" claimed on his 2020 tax returns. D. Ex. C (showing a cost to acquire of $883,327.51).

renovations, refurbishment, landscaping, repairs, and appliances.[11] D. Ex. A. The Court also finds credible Bastarache's testimony that he was at the Property approximately eight hours a day, three days a week for 1.5 months. Tr. 2 27:5–19. Although no value was accorded for these "sweat-equity" services, the Court will, in fairness, assign an attributed value of $50 per hour for the approximately 144 hours worked, leading to a total of $7,200 for Bastarache's labor.[12] Together, these post-Transfer renovation costs incurred by Bastarache total $71,631.90.

During the trial, expert reports and testimony were provided by Edward Sutton for the Trustee and Gary Swift for the Defendants.[13] P. Ex. 8; D. Ex. D. The parties' experts opined as to the fair market value of the Property: $850,000 for the Defendants and $1,185,000 for the Trustee. The Court concludes that neither valuation is completely credible or appropriately adjusted. "Courts give significant deference to marketplace values and to values reached in the context of an arm's length transaction between a willing buyer and a willing seller." *Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500 B.R. 371, 381 (Bankr. S.D.N.Y. 2013) (internal quotation marks omitted). "Absent some reason to distrust it, the

---

[11] The Court finds that the other $2,730.59 in claimed expenditures were for carrying costs that were not value additive. These include electric utility bills and security deposit, insurance, office supplies, recording fees, and internet.

[12] Other courts have rejected sweat equity as value. *See, e.g.*, *Weir v. Chadwick (In re Chadwick)*, No. 09-1183, 2011 WL 477858, at *11 (Bankr. E.D. Tenn. 2011) (rejecting debtor's sons' sweat equity services as value because transfers of interests received had no connection to amount of services). Here, however, Bastarache's services were directly related to improving the Property and, importantly, they already happened. *Cf. Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203–06 (1988) (rejecting "future contributions of 'labor, experience, and expertise'" as value so as to circumvent the absolute priority rule because such was "intangible, inalienable, and, in all likelihood, unenforceable").

[13] Sutton is a Connecticut licensed real estate broker. Swift is a certified real estate appraiser.

6

market price is a more reliable measure of . . . value than the subjective estimates of one or two expert witnesses." *Id.* at 382.

A little over a month after the Transfer, the Property was relisted by Bastarache on the MLS at $1,185,000 and promptly went under contract soon thereafter in an arms' length transaction between a willing buyer and a willing seller. Nothing in the record disputes or qualifies that proposition. The market thus unmistakably decided that as of the date of that contract, the Property's fair market value was exactly $1,185,000. Further, the parties have identified no market forces over the 1.5 months between the Transfer and the contract date that would warrant a meaningful adjustment to that number. The only differences between the Property on the Transfer date and its sale date were those related to the work that Bastarache expended $71,631.90 on through his labor and materials. Thus, based upon its weighing of this record, the Court finds that the fair market value of the Property on the date of the Transfer from the Debtor to Bastarache was $1,113,368.81 (*i.e.*, the sale price minus the aforementioned credited expenditures).

The Defendants argue that the Property could not even be worth $1,099,000 on the Transfer date because it was listed at that lower price, but did not sell. Bastarache and Sutton agreed, however, that buyers in the $1,000,000+ range generally want to buy houses that have no outstanding renovations to be completed, particularly in Wallingford. Tr. 1 94:5–13, 156:21–157:9. Moreover, value under the Bankruptcy Code "must be determined from the creditors' standpoint." *In re Waterford Wedgwood USA, Inc.*, 500 B.R. at 381; *see also Cadle Co. v. White*, No.

302-CV-00030-TPS, 2006 WL 798900, at *9 (D. Conn. Mar. 21, 2006) ("Courts in this district applying Connecticut's UFTA as well as courts interpreting the UFTA in other jurisdictions have held value to mean the type of consideration capable of satisfying or partially satisfying a creditor's claims."). That another creditor could have done exactly what the Defendants did—took the Property subject to its mortgages, renovated it, and then sold the Property—means that the Property had worth beyond the alleged fair market value of $850,000 posited by Swift.[14] In contrast, Sutton, the Trustee's expert, does begin with the later sale price of the Property; however, he does not adequately or fairly account for the value of the work and materials provided by Bastarache.[15] The Court thus finds that the value of the Property as of the date of the Transfer from the Debtor to Bastarache was best represented by taking the subsequent sale price and subtracting Bastarache's reasonable expenses.[16]

2. Conclusions of Law[17]

2.1 Jurisdiction

The United States District Court for the District of Connecticut has jurisdiction over these proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy

---

[14] The Court recognizes Swift's credentials and years of service, but notes that every time he was asked why he did not include the subsequent sale of the Property as a comparable, he was evasive, providing no cogent answer as to his actions. For example, when provided with a quote from the Uniform Standards of Professional Appraisal Practice, of which the Court took judicial notice, that "[d]ata subsequent to the effective date may be considered in developing a retrospective value[,]" he said he "[w]asn't aware of it." Tr. 2 91:24–92:13.

[15] Although he credits the inclusion of new appliances, he labels many things carrying costs that were in fact improvements.

[16] This finding also makes much of the discussion of the parties' experts, their qualifications, and whatever attacks were lobbed at them red herrings.

[17] Any Conclusions of Law that are properly Findings of Fact are so found.

Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(H). To the extent that the claims asserted in this Adversary Proceeding are *Stern* claims,[18] the parties have consented to the entry of final orders or judgments by this Court (ECF No. 17).

 2.2 Discussion

 Under 11 U.S.C. § 548(a)(1)(B), a trustee may "set aside a transfer of property if (1) the debtor had an interest in property; (2) a transfer of that interest occurred on or within two years of the bankruptcy petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the debtor received less than a reasonably equivalent value in exchange for such transfer." *Gunsalus v. Cnty. of Ontario, N.Y.*, 37 F.4th 859, 864 (2d Cir. 2022) (cleaned up). The Defendants have conceded the first three of these elements, such that only "reasonably equivalent value" is in dispute.

 Additionally, under § 544(b), a trustee may "avoid any transfer of an interest of the debtor . . . that is voidable under applicable law by a creditor holding an unsecured claim." *United States v. Miller*, 604 U.S. 518, 523 (2025) (quoting 11 U.S.C. § 544(b)(1)). "[T]rustees typically rely on state statutes to supply the 'applicable law' for avoidance suits under § 544(b)." *Id.* Here, the applicable law is

---

[18] *See generally Stern v. Marshall*, 564 U.S. 462 (2011).

CUFTA, which, coupled with § 544(b),[19] allows the Trustee to avoid a transfer made within four years of the petition if made "without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer[.]" Conn. Gen. Stat. §§ 52-552f(a), 52-552j.[20] As with the claim under the Bankruptcy Code, only "reasonably equivalent value" is in dispute in this case.

Further, under § 550(a) of the Bankruptcy Code, the Trustee may recover from the initial transferee or any immediate or mediate transferee the value of any transfer avoided under §§ 544 or 548 for the benefit of the estate. 11 U.S.C. § 550(a). The Trustee may not recover from any immediate or mediate transferee that "takes for value . . . in good faith, and without knowledge of the voidability of the transfer avoided[.]" 11 U.S.C. § 550(b)(1). There is no dispute that Wavecrest paid no money to Bastarache for the conveyance of the Property, such that, if Bastarache is liable, so is Wavecrest.[21]

As emphasized herein, the only question before the Court is whether Bastarache gave "reasonably equivalent value" for the Property. There are two components to this analysis: (1) the value of the Property and (2) the value of

---

[19] The parties do not dispute that the Trustee has standing under 11 U.S.C. § 544(b) because there are multiple proofs of claim evidencing that the Debtor had unsecured creditors that could have avoided the Transfer under state law.

[20] The Trustee also cited Conn. Gen. Stat. § 52-552e(a)(2) in the Complaint as a basis for avoiding the Transfer but did not include any citation to that statute in her posttrial briefs. The difference between § 52-552e(a)(2) and § 52-552f(a) is that the latter is concerned with a debtor's insolvency and the former other forms of financial distress. Because the Defendants have conceded that the Debtor was insolvent at all relevant times, ECF No. 55, citation to the former is unnecessary.

[21] There has been no claim against the third party who purchased the Property on December 14, 2020, nor would there be under the Court's finding that that sale appears to have been for fair market value.

10

Bastarache's consideration. As noted in the Findings of Fact above, the Property's fair market value was $1,113,368.81 at the time of the Transfer. Bastarache, meanwhile, only provided $890,740.85 in aggregate consideration for the Transfer. That analysis leaves a gulf of $222,627.96.

Had the Trustee taken the Property on behalf of the estate and sold it, the estate would have been responsible for closing costs.[22] According to Bastarache's 2020 tax returns, he paid $81,895 in closing costs in selling the Property to the third-party buyer, which included conveyance taxes, attorney's fees, and the broker commission. D. Ex. C. The Court finds no reason to doubt the evidence on the amount of these closing costs. Subtracting that additional amount from the difference of $222,627.96 between Bastarache's consideration and the value of the Property leaves $140,732.96.[23] That sum is the amount that Bastarache, as the initial transferee, and Wavecrest, as the immediate transferee, are liable on.

The Defendants, however, argue that, because the statutes only require "reasonably equivalent value," not exact value, they are not liable at all for a constructive fraudulent transfer. In *BFP v. Resolution Trust Corp.*, 511 U.S. 531

[22] Likewise, any creditor that took the Property under CUFTA would also be burdened with closing costs. The Court accordingly will not in effect surcharge the Defendants for what would have been the estate's burden; however, the Court cannot credit the amount of tax paid on capital gains because that amount does not necessarily directly correlate with amounts that the Trustee would have had to pay. *See Picard v. Cohen (In re Bernard L. Madoff Investment Secs. LLC)*, No. 10-04311 (SMB), 2016 WL 1695296, at *15 (Bankr. S.D.N.Y. Apr. 25, 2016).

[23] This number is less than—but unusually close to—the amount that Bastarache claimed as a capital gain on his tax returns. D. Ex. C (claiming $150,037 in capital gains). The near correspondence between, on the one hand, the Court's findings for the value of the consideration provided for the Transfer and the amount the Court is finding the Defendants liable on and, on the other hand, Bastarache's claimed cost to acquire and capital gains on his 2020 tax returns suggest that he himself thought that he had acquired a property worth in excess of his consideration. In other words, Bastarache's own contemporaneous numbers reflected in his tax returns corroborate the Court's findings as to value.

11

(1994), the Supreme Court stated that its "discussion assume[d] that the phrase 'reasonably equivalent' means 'approximately equivalent,' or 'roughly equivalent.'" *Id.* at 540 n.4. But the Supreme Court also recognized that "the 'reasonably equivalent value' criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) *outside the foreclosure context.*" *Id.* at 545 (emphasis added). Had Bastarache initiated foreclosure proceedings in the Connecticut Superior Court, an auction may well have netted him the Property at a credit bid, but he would also have had to lay out significant transaction costs to do so.[24]

Thus, although the Court "need not strive for mathematical precision[,]" it "must keep the equitable purposes of the statute firmly in mind, recognizing that *any significant disparity* between the value received and the obligation assumed . . . will have significantly harmed the innocent creditors." *In re Tribune Co. Fraudulent Conveyance Litigation*, 10 F.4th 147, 172 (2d Cir. 2021) (emphasis added).[25] The Court finds that the difference between the value of the consideration ($890,740.85) combined with the later closing costs ($81,895) and the value of the Property

---

[24] Bastarache's testimony that he did not wish to deal with low bids in a foreclosure auction ignores that he could credit bid the debt owed to him, which would include attorney fees and costs, *see* P. Ex. 6 (Note), and outbid any bidder that would not satisfy the debt. Although it is certainly understandable why he would not want to go the foreclosure route—the COVID-19 pandemic halted most foreclosures at the time—his choice not to do so renders *BFP* largely irrelevant to this analysis. [25] Additionally, "[t]o determine whether reasonably equivalent value was provided, the Court must ultimately examine the totality of the circumstances, including the arms-length nature of the transaction; and the good faith of the transferee." *In re Tribune Co. Fraudulent Conveyance Litigation*, 10 F.4th at 173 (cleaned up). Bastarache may merely have been trying to save his investment, but considering his later investment in the Debtor's sneaker business, Tr. 1 198:8–199:5, the Court cannot conclude that Bastarache and the Debtor fully operated at arm's length. Even assuming that the relationship was arm's length, the Court still finds that the disparity is too significant.

($1,113,368.81) is too great to ignore. Although it represents approximately 87% of the value of the Property, it also represents significant real dollars that will be used to pay unsecured creditors, particularly when compared to the $325,000 amount loaned under the Note.[26] *See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 578 (7th Cir. 1998) ("Fraudulent transfer law seeks to preserve assets of the estate for creditors"); *see also BFP*, 511 U.S. at 545 ("reasonably equivalent value" will "ordinarily have a meaning similar to fair market value . . . outside the foreclosure context"). The Court therefore finds that Bastarache did not provide "reasonably equivalent value" for the Transfer of the Property from the Debtor to Bastarache.

The Trustee also asks for prejudgment interest at the 10% specified in Conn. Gen. State. § 37-3a. "The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion." *See Kittay v. Korff (In re Palermo)*, 739 F.3d 99, 106 (2d Cir. 2014). "Prejudgment interest is normally awarded in avoided transfer cases to compensate for the value over time of the amount recovered." *Picard v. BAM L.P. (In re Bernard L. Madoff Investment Secs. LLC)*, 624 B.R. 55, 63 (Bankr. S.D.N.Y. 2020). "Under the Court's analysis, the award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of

---

[26] The Court recognizes that Bastarache took some risk in taking the Property in satisfaction of the Note, but any notion that Bastarache loaned the Debtor the money without a reasonable expectation of repayment or that his mortgage would be underwater, which would be implied by Swift's value for the Property, is preposterous and inconsistent with his knowledge, experience, and sophistication.

13

fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833–34 (2d Cir. 1992).

This Adversary Proceeding was filed over two years ago. The Trustee has thus been deprived of money that she could have deployed to administer a dividend to unsecured creditors—money that will be further diminished by the costs associated with the trial of this Adversary Proceeding. The Court thus finds that, after consideration of the equities, the facts and circumstances of this case, and the purposes of fraudulent transfer law, prejudgment interest is appropriate here; however, the Court will apply the federal rate. *In re Bernard L. Madoff Investment Secs. LLC*, 624 B.R. at 63 ("The Second Circuit has held that where judgments are predicated on both state and federal claims, the federal interest rate must apply to awards of prejudgment interest."). The federal judgment rate on the date of the Complaint was 5.44%. The current federal judgment rate is 3.43%. The Court finds that the current rate adequately compensates the Trustee and will thus employ the current federal judgment rate of 3.43%, measured from the filing date of the Complaint. Post-judgment interest will accrue at the same rate until payment is made to the Trustee.

3. Conclusion

The Court finds that the Debtor transferred the Property to Bastarache for less than "reasonably equivalent value" and while the Debtor was insolvent.

14

Therefore, the Trustee may avoid the Transfer under both § 548(a)(1)(B) of the Bankruptcy Code and Conn. Gen. Stat. § 52-552f(a). Accordingly, the Trustee shall recover the net value of the Transfer, $140,732.96, plus pre- and post-judgment interest from the date of the filing of the Complaint,[27] jointly and severally from the Defendants. A judgment consistent with this Memorandum of Decision will enter separately upon the Court's docket.

IT IS SO ORDERED at Hartford, Connecticut this 20th day of February 2026.

*James J. Tancredi*
*United States Bankruptcy Judge*
*District of Connecticut*

---

[27] For the avoidance of doubt, such interest is simple interest based upon a 365-day year. There will also be no compounding of the prejudgment interest.